[Cite as *State v. Dahms*, 2017-Ohio-4221.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
SENECA COUNTY


STATE OF OHIO,

    PLAINTIFF-APPELLEE,                      CASE NO. 13-16-16

    v.

JEFFREY B. DAHMS,                         O P I N I O N

    DEFENDANT-APPELLANT.


Appeal from Seneca County Common Pleas Court
Trial Court No. 15-CR-0163

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision: June 12, 2017


APPEARANCES:

    *Jennifer Kahler* for Appellant

    *Stephanie J. Reed* for Appellee

**PRESTON, P.J.**

{¶1} Defendant-appellant, Jeffrey B. Dahms ("Dahms"), appeals the May 6, 2016 judgment entry of sentence of the Seneca County Court of Common Pleas. For the reasons that follow, we affirm in part, and reverse in part.

{¶2} This case stems from a break-in at a Subway restaurant located in Fostoria, Ohio around 1:52 a.m. on April 21, 2015 in which an object was thrown through the restaurant's window and a cash drawer was stolen. Law enforcement learned from Kira Harrold ("Harrold"), one of Dahms's girlfriends, that Dahms was the person who committed the break-in. Around the time of the break-in, Dahms was known to stay at the home of his sister, Teresa Brown ("Teresa"), the home of his friend, Sarah Thornton ("Thornton") in Findlay, Ohio, or with other friends at Nye's Trailer Park in Fostoria, Ohio. The Subway restaurant is located near Nye's Trailer Park. After Dahms learned that he was suspected of the break-in, he called Thornton numerous times and wrote her several letters requesting that she provide law enforcement with an alibi for him—namely, to tell law enforcement that Dahms was at her residence the night of April 20-21, 2015. To secure her statement, Dahms not only promised to repay her $500 that Thornton loaned him, but Dahms also threatened to turn Thornton into the Hancock County Metropolitan Housing Authority ("Housing Authority") for violating the terms of her subsidized-housing lease.

{¶3} On August 5, 2015, the Seneca County Grand Jury indicted Dahms on four counts, including: Count One of breaking and entering in violation of R.C. 2911.13(A), (C), a fifth-degree felony; Count Two of bribery in violation of R.C. 2921.02(C), (G), a third-degree felony; Count Three of intimidation of a witness in a criminal case in violation of R.C. 2921.04(B)(2), (D), a third-degree felony; and Count Four of attempted complicity to tampering with evidence in violation of R.C. 2923.02(A), (E)(1), 2923.03(A)(1), (F), and 2921.12(A)(1), (B), a fourth-degree felony. (Doc. No. 1).

{¶4} On August 14, 2015, Dahms appeared for arraignment and entered pleas of not guilty. (Doc. No. 7). On October 2, 2015, Dahms filed a motion for relief from "Prejudicial Joinder," which he withdrew on October 13, 2015. (Doc. Nos. 22, 34). Also on October 13, 2015, Dahms filed a motion to continue trial, which the trial court granted. (Doc. Nos. 35, 37). On November 24, 2015, Dahms filed a motion for "Supplemental Discovery" requesting an evidentiary hearing. (Doc. No. 43). On November 30, 2015, Dahms filed a motion to continue trial, which the trial court granted. (Doc. Nos. 45, 47).

{¶5} That same day, Dahms filed a motion for "a Pre-Trial Copy of the Transcript of the Grand Jury Proceedings." (Doc. No. 44). On December 3, 2015, the State filed a memorandum in opposition to Dahms's motion for "a Pre-Trial Copy of the Transcript of the Grand Jury Proceedings." (Doc. No. 48). After a

hearing on December 4, 2015, the trial court granted Dahms's motion for supplemental discovery, scheduled an evidentiary hearing for December 17, 2015, and took under advisement Dahms's request for a copy of the transcript for the grand jury proceedings. (Doc. Nos. 50, 51). On December 9, 2015, the trial court denied Dahms's request for a copy of the transcript of the grand jury proceedings. (Doc. No. 53). An evidentiary hearing was held on December 17, 2015. (Doc. No. 56); (Dec. 17, 2015 Tr. at 1).

{¶6} The case proceeded to a jury trial on April 26-29, 2016. (Doc. No. 85). The jury found Dahms guilty as to the counts in the indictment. (Doc. Nos. 85, 86); (Apr. 30, 2016 Tr. at 2-3). On May 6, 2016, the trial court sentenced Dahms to 12 months in prison on Count One, 36 months in prison on Count Two, 36 months in prison on Count Three, and 18 months in prison on Count Four, and ordered that Dahms serve the terms consecutively for an aggregate sentence of 102 months. (Doc. No. 89).

{¶7} On May 25, 2016, Dahms filed his notice of appeal. (Doc. No. 93). He raises five assignments of error for our review. For ease of our discussion, we will address Dahms's first and second assignments of error together, followed by his third, fourth, and fifth assignments of error.

## Assignment of Error No. I

**The State failed to support Appellant's convictions for Bribery and Intimidation of a Witness with legally sufficient evidence.**

**Assignment of Error No. II**

**Appellant's convictions fell against the manifest weight of the evidence.**

{¶8} In his first assignment of error, Dahms argues that his bribery and intimidation-of-a-witness-in-a-criminal-case convictions are based on insufficient evidence.[1]  In his second assignment of error, Dahms argues that his bribery, intimidation-of-a-witness-in-a-criminal-case, breaking-and-entering, and attempted-complicity-to-tampering-with-evidence convictions are against the manifest weight of the evidence.

{¶9} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts."  *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997).  As such, we address each legal concept individually.

{¶10} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt."  *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997).  Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most

---

[1] Dahms does not challenge the sufficiency of the evidence supporting his other convictions.

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins* at 386.

{¶11} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the

conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶12} At trial, the State offered the testimony of Kira, who testified that she was sleeping at her sister's, Kady Harrold ("Kady"), house the night of April 20-21, 2015. (Apr. 26, 2016 Tr., Vol. II, at 160-161). According to Kira, she was woken early that morning by Dahms, who was her boyfriend at the time. (*Id.* at 161). Kira testified that Dahms told her that "he threw a brick through Subway's window," and that Dahms was holding "a wad of cash and a bag full of change." (*Id.* at 164-165). Kira stated that Dahms also told Kady and Kady's boyfriend, Andy, about what he had done. (*Id.* at 165).

{¶13} According to Kira, she revealed to law enforcement that Dahms was the person who committed the Subway restaurant break-in because she was mad at him since they "had gotten into it and [she] went to the hospital and spoke with the officer. And it was just, the truth needed to come out. [Dahms] should be punished for what he done [sic]." (*Id.* at 166-167). Kira provided law enforcement with a written statement reflecting that Dahms committed the Subway restaurant break-in. (*Id.* at 167). Kira testified that Dahms called her "a snitch." (*Id.*). She further testified that she received phone calls and letters from Dahms asking her to recant her statement to law enforcement. (*Id.* at 169-170). (*See also* State's Exs. 8, 9).

Kira identified State's Exhibit 8 as those letters and read a portion of the letters for the jury, and identified State's Exhibit 9 as those phone calls, which were played, in part, for the jury. (Apr. 26, 2016 Tr., Vol. II, at 169-175); (*See also* State's Exs. 8, 9). Kira did not agree to change her statement "[b]ecause it's the truth." (Apr. 26, 2016 Tr., Vol. II, at 177).

{¶14} On cross-examination, Kira testified that she alleged in February 2015 to law enforcement that Dahms assaulted her. (*Id.* at 178). Kira testified that she went to the hospital in April 2015 after Dahms "drug [her] down the street with a car" but did not pursue charges against Dahms. (*Id.* at 180-181).

{¶15} On re-direct examination, Kira testified that she knew specific details regarding the Subway restaurant break-in, which she reported to Detective Shilo Frankart ("Detective Frankart") of the Fostoria Police Department, because Dahms "told" her those details. (*Id.* at 182-183).

{¶16} On re-cross examination, Kira testified that she could have learned those details from someone other than Dahms, but maintained that she heard the details of the break-in from him. (*Id.* at 183-184).

{¶17} Next, Kady testified that Dahms told her that "he broke into Subway." (*Id.* at 184-185). She testified that Dahms was at her house "shortly after" the break-in. (*Id.* at 185). On cross-examination, Kady clarified that Dahms confessed about

the break-in when she "was just waking up." (*Id.* at 190-191). Kady stated Andy and Kira were also present. (*Id.* at 191).

{¶18} Richard Ray Evans ("Evans") testified that he was with Dahms before the break-in and recalled Dahms asking him if he wanted to "hit a lick," meaning "steal some money." (*Id.* at 194-196). Evans declined Dahms's offer, Dahms left, and Evans again saw Dahms at 1:30 in the morning "[c]arrying a safe box." (*Id.* at 196-197). According to Evans, Dahms told him that he got the "safe box" from the Subway restaurant. (*Id.* at 197).

{¶19} Evans testified that he recalled a "gray with a blue skull" hooded sweatshirt belonging to Dahms in Dahms's vehicle, which Evans took possession of after Dahms was arrested. (*Id.* at 199). According to Evans, he "wore [the hooded sweatshirt] to the mud bogs one day" and that it is "still out at the mud bogs." (*Id.*). Evans testified that Dahms told him where he hid the "safe box" at Nye's Trailer Park. (*Id.* at 206).

{¶20} Evans identified State's Exhibit 10 as recordings of phone calls that he received from Dahms, which were played for the jury. (*Id.* at 200-204); (State's Ex. 10). In those phone calls, Dahms can be heard telling Evans to "take that trash out and fucking get rid of all the junk in my room," "get rid of that trash," and to "[g]et rid of that, bro." (Apr. 26, 2016 Tr., Vol. II, at 202-204); (State's Ex. 10). According to Evans, Dahms was referring to "[t]he safe and then maybe whatever's

in the car" when he was instructing him to get rid of the "trash." (Apr. 26, 2016 Tr., Vol. II, at 204). Evans testified that he did not get rid of the "safe box." (*Id.* at 207).

**{¶21}** On cross-examination, Evans testified that he did not report to Detective Frankart that he knew the location of the "safe box." (*Id.* at 209). Regarding the hooded sweatshirt, Evans testified that he could not provide it to Detective Frankart. (*Id.* at 211-212). Although Evans did not see the surveillance video, he knew what hooded sweatshirt Detective Frankart was searching for because Evans "watched [Dahms] walk down the street in the middle of the neighborhood with the safe box and the hoody on" after he committed the break-in. (*Id.* at 221).

**{¶22}** On re-direct examination, Evans provided the following clarification regarding the hooded sweatshirt:

> Well, when you go to the mud bogs, it was chilly out, so I had [the hooded sweatshirt] on. Jumped out of the truck in probably 3 or 4 foot [sic] of mud. Once the hoody was soaked with mud, it was cold, because it was sort of, like, rainy out.
>
> I took it off. My buddy got stuck on his four-wheeler. We didn't have no [sic] rope or no [sic] chain, so I'm like, well, hell, tie this hoody up to it and try to pull him out. It was a four-wheeler, not a truck, an ATV.

> So we tied the hoody to the bumper of the truck and the ATV ripped it clean in half when we tried to pull it out, so we just left [the hooded sweatshirt] there.

(*Id.* at 223). According to Evans, he did not provide Detective Frankart with the location of the safe box because of his close friendship with Dahms. (*Id.* at 224).

{¶23} The State next offered the testimony of Thornton who testified that she saw Dahms at her residence "about 1:00 in the afternoon" on April 20, 2015. (Apr. 27, 2016 Tr., Vol. I, at 4-5). According to Thornton, Dahms was at her residence the next morning when she woke around 7:50 a.m. (*Id.* at 5-6). Thornton went to bed the previous evening between 11:00 p.m. and 1:00 a.m. (*Id.* at 6-7). Thornton received phone calls and letters from Dahms since that day. (*Id.* at 7). (*See* State's Exs. 11, 12, 13, 14, 15).

{¶24} Thornton identified State's Exhibit 15 as a recording of a phone call from Dahms to Thornton, which was played for the jury. (April 27, 2016 Tr., Vol. I, at 7-8). In that recording, Dahms can be heard telling Thornton about the Subway break-in and stating,

> Just remember that if anybody asks you, because it happened Monday the 20th. * * * But I stayed at your house on the 20th okay? * * * I stayed at your house on the 20th, Monday the 20th. All right?

(*Id.* at 9); (State's Ex. 15). According to Thornton, Dahms asked her to "[w]rite a statement" and told her to include in her statement "[t]hat he was at [her] house and he was there." (April 27, 2016 Tr., Vol. I, at 22). Thornton did not make that statement because she "didn't want to be involved." (*Id.* at 22-23). According to Thornton, she did not know if Dahms left her residence between the time she went to sleep on April 20 and the time she woke on April 21, 2015. (*Id.* at 23).

{¶25} Thornton identified State's Exhibits 11, 12, 13, and 14 as the letters she received from Dahms. (*Id.* at 24). In one of the letters, Dahms "mentions giving [Thornton] $500 for a birthday present for [Thornton's adult son]." (*Id.* at 25). Thornton interpreted that statement to mean that Dahms would repay her the money that he owed her if she wrote the statement. (*Id.*). Dahms confesses in that letter that he owed Thornton money, and Thornton testified that Dahms owed her "about $400." (*Id.*). Thornton testified that Dahms never gave her son money for his birthday before. (*Id.*).

{¶26} In another letter, Dahms tells Thornton "that his sister is going to call [the Housing Authority]." (*Id.* at 26). Thornton interpreted that statement to mean that she needed to "[w]rite the statement" to prevent Teresa from calling the Housing Authority, which would result in Thornton losing her "subsidized housing" assistance. (*Id.*).

**{¶27}** On cross-examination, Thornton testified that she has "some memory loss because [she] had strokes, so [she] can't remember everything." (*Id.* at 32). According to Thornton, Dahms asked her to write a statement reflecting that he was at her residence during the times that she could remember—before she went to sleep and after she woke. (*Id.* at 33). Thornton stated that Dahms asked her to write a truthful statement, not a lie. (*Id.*). She testified that she would not lie for Dahms. (*Id.* at 34). Thornton testified that her sister-in-law, who read Dahms's letters, suggested to Thornton that Dahms was trying to bribe her. (*Id.* at 38). Thornton testified that she eventually blocked Dahms from being able to call her because he threatened her for not providing the statement that he wanted her to provide to law enforcement. (*Id.* at 48).

**{¶28}** Thornton testified that Dahms's bedroom was located on the second floor of her two-story apartment. (*Id.* at 42). She stated that she sleeps in a chair in the living-room portion of her apartment, which is located within hearing distance of the front and back doors to the apartment. (*Id.* at 43-44). She testified that she did not hear Dahms leave the apartment after she went to sleep on April 20, 2015. (*Id.* at 44). According to Thornton, when she woke at 7:50 a.m. on April 21, 2015, she saw Dahms walking down the stairs. (*Id.* at 44). The Subway restaurant is approximately 15-20 minutes from Thornton's apartment. (*Id.* at 45). Thornton testified that Dahms did not have a vehicle. (*Id.*). Thornton was not aware if anyone

provided Dahms a ride from her apartment the night of April 20-21, 2015. (*Id.* at 46).

{¶29} The following exchange took place regarding Dahms threatening Thornton:

[Thornton]: I took it as a threat. That's why I blocked him. Because he just kept yelling at me. Actually, he called me a B-word and some, you know, some profound language he didn't need to use at me and that's why I took it as threatening me.

Because you don't talk to me like that, especially you know, when I give you a place to live and, you know, I've been your friend for so many years. But the way - - he was yelling and screaming at me all the time and it as, like, what do you want me to do? There ain't [sic] really much I can do.

You know, and then he just kept yelling at me. That's why he got blocked. He wouldn't leave me alone.

[Dahms's counsel]: Because he wanted you to give that statement and you decided you wouldn't give that statement - -

[Thornton]: Right.

(*Id.* at 48). The defense then played for the jury another phone call from Dahms to Thornton. (*Id.* at 50); (State's Ex. 15). In that recording, Dahms can be heard saying to Thornton,

Listen. Sunday, Monday, and Tuesday night, I was there. And then Wednesday is when I went to Fostoria. I went to Fostoria Wednesday night, stayed overnight with Kira, and then came back on Thursday and started my job. Because Wednesday night is when I got my car.

And I want you to tell him that * * * Tell him that you'll go to court for me.

(Apr. 27, 2016 Tr., Vol. I, at 52). Thornton testified that she was concerned that she would be in trouble if she were to provide a statement to law enforcement. (*Id.* at 63).

{¶30} Rickey Perrin ("Perrin") testified on behalf of the State. (*Id.* at 63). In exchange for his testimony, Perrin received a favorable sentence for his drug-related conviction. (*Id.* at 64). Perrin testified that he was incarcerated with Dahms and that Dahms confessed to smashing the window of the Subway restaurant and stealing a cash box. (*Id.* at 65-67). Regarding Thornton, Perrin testified that Dahms told him

-15-

that [Thornton] was a girl that he was claiming that he stayed the night at her house and that she was confused because he know [sic] he didn't stay the night there, but she didn't know what she was talking about because the things she was saying was making him look good.

(*Id.* at 68).

{¶31} On cross-examination, although Perrin was in the courtroom at the time of Dahms's evidentiary hearing, Perrin testified that he did not remember any of the evidence presented during Dahms's hearing because he "was trying to get out of jail that day, too, so [he] didn't pay no [sic] attention to what was going on with [Dahms]." (*Id.* at 70). However, on re-cross examination, Perrin recalled that Dahms's evidentiary hearing lasted "for a long time." (*Id.* at 85).

{¶32} Detective Frankart testified that he investigated the Subway restaurant break-in. (Apr. 27, 2016 Tr., Vol. II, at 90-92). According to Detective Frankart, Kira reported to law enforcement that Dahms was the person who broke into the Subway restaurant. (*Id.* at 97). Kira reported to law enforcement that Dahms confessed to her to throwing a brick through the Subway restaurant's window and stealing the cash drawer—facts which were not known to the public. (*Id.* at 98). Kira reported that she saw Dahms the night of the break-in and saw that he had $300, which matched the amount of money stolen from the Subway restaurant. (*Id.* at 97-98).

{¶33} Detective Frankart identified State's Exhibit 20 as a disc containing audio recordings of Dahms's phone calls to Teresa. (*Id.* at 117). One of those phone calls was played for the jury in which Dahms can be heard telling Teresa "to go get [Thornton] and get a statement to the police." (*Id.* at 120); (State's Ex. 20). Dahms can further be heard telling Teresa,

Because when they take this stuff to the grand jury * * * I need you to have that statement in with that stuff so they can say, "Well, the guy, this lady's claiming that he stayed overnight."

Do you know what I mean? And [Thornton] know [sic] that I stayed there.

(Apr. 27, 2016 Tr., Vol. II, at 120); (State's Ex. 20). Later in the conversation, Dahms can be heard instructing Teresa, "All I wanted you to do was pick up the * * * statement [from Thornton] that I wrote out and had notarized." (Apr. 27, 2016 Tr., Vol. II, at 125); (State's Ex. 20).

{¶34} Detective Frankart testified that Dahms identified Thornton as an alibi witness for the night of the Subway break-in. (Apr. 27, 2016 Tr., Vol. II, at 108). He stated, "During the first interview, she was not a main defense of his. It became as the investigation proceeded, she became a main defense of him, his alibi for the night." (*Id.* at 109). Detective Frankart identified State's Exhibits 11, 12, 13, and

-17-

14 as the letters that Dahms wrote to Thornton. (*Id.* at 149-150); (State's Ex. 11, 12, 13, 14). Detective Frankart read portions of those letters for the jury:

"Sarah, my sister is mad and saying she's going to call the lady at your office and call [the Housing Authority] on you. She is mad because I stayed that night but now you won't help me."

* * *

"I need you to write that statement, Sarah. If you don't write it, my lawyer said they are going to charge me. If that happens, then he's going to have to make you come to court, like, five times and then you also have to come to trial. And if you don't show up to court all those times, the judge will have you arrested.

Do you have a ride to court? Hell no, you don't. It would be a lot better if you would just write the statement and turn it in, because then I won't even get charged and nobody even has to go to court.

Teresa. Teresa told me if you turn your back on me, then she will call [the Housing Authority] on you and tell them I lived with you and you will lose your [housing assistance] because she is mad that you don't answer the phone.

I am supposed to start school in August. If they charge me, I won't be able to. I will get $3,000 in loans, and I told you I will give you $500 for a late birthday present for [Thornton's adult son].

P.S. Please do this. My sister's mad and wants to call [the Housing Authority]."

(Apr. 27, 2016 Tr., Vol. II, at 151-52); (State's Exs. 12, 13).

{¶35} Detective Frankart identified State's Exhibit 17 as the surveillance video depicting the break-in of the Subway restaurant, which was subsequently played for the jury. (Apr. 27, 2016 Tr., Vol. II, at 94); (State's Ex. 17). Although the individual seen in the surveillance video is unidentifiable from the video, Detective Frankart testified that Dahms matches the build of the person seen in the video. (Apr. 27, 2016 Tr., Vol. II, at 96-97, 145). Detective Frankart testified that the surveillance video depicts only one perpetrator. (*Id.* at 101). He further testified that his investigation revealed that Dahms was receiving transportation from others because his vehicle was impounded prior to the Subway restaurant break-in. (*Id.* at 113). Detective Frankart testified that Evans told him that Dahms stole "over $300" from the Subway restaurant, and that Evans told Detective Frankart where Dahms hid the safe box. (*Id.* at 102). Detective Frankart found the safe box where Evans told him Dahms hid it. (*Id.* at 102-103). Regarding the hooded sweatshirt, Detective Frankart testified, "Through my investigation, I found out that, according to Teresa

Brown and [Evans], that a hooded sweatshirt was in [Dahms's] vehicle." (*Id.* at 107). However, Detective Frankart was unable to retrieve that hooded sweatshirt. (*Id.*).

{¶36} Detective Frankart identified State's Exhibit 7 as an extraction report depicting Facebook messages between Dahms and Kira. (*Id.* at 154). In one message from Dahms to Kira on April 20, 2015 at 4:39 p.m., Dahms informs Kira that he "will be there in a bit"—meaning that he would be at Nye's Trailer Park in a bit. (*Id.* at 156); (State's Ex. 7).

{¶37} Detective Frankart testified that Dahms claimed that another individual, Kyle Yonikuss ("Yonikuss"), was the person who committed the Subway restaurant break-in. (*Id.* at 157). Detective Frankart investigated Dahms's claim and learned from another law-enforcement officer that Yonikuss "had a warrant for a theft" and that Yonikuss was believed to have "left town and went to Wyoming." (*Id.* at 157-158). Through his investigation, Detective Frankart did not find any evidence that Dahms accused Yonikuss of the break-in to Kira, or any communications between Kira and Yonikuss, but learned from Evans that Yonikuss did not commit the break-in. (*Id.* at 158). Evans confirmed that Yonikuss "went to Wyoming prior to the break-in." (*Id.*). According to Detective Frankart, Dahms blamed the break-in on Yonikuss because Yonikuss previously blamed a theft on Dahms for which Dahms was criminally charged. (*Id.* at 159).

{¶38} Detective Frankart testified that he concluded that Dahms's motive to commit the Subway restaurant break-in was to be able to "get his vehicle out of impound." (*Id.* at 110). He testified that Dahms's versions of events were not consistent and "were all over the place," especially regarding how he obtained the money to pay his vehicle's impounding fees. (*Id.* at 110-111).

{¶39} On cross-examination, Detective Frankart testified that Thornton confirmed that Dahms was at her residence when she went to sleep and when she woke. (Apr. 29, 2016 Tr., Vol. I, at 115). Thornton further confirmed that she sleeps by the front door but did not hear Dahms leave or return the night of April 20-21, 2015. (*Id.*). Detective Frankart testified that he did not find any messages on Dahms's phone seeking a ride from Findlay to Fostoria the night of the Subway restaurant break-in. (Apr. 27, 2016 Tr., Vol. II, at 202).

{¶40} Detective Frankart read for the jury a portion of his investigative statement,

> "Through my investigation, I found that Sarah Thornton is a close friend of [Dahms's], who he has known for approximately 13 years. She is also someone [Dahms] feels is easily manipulated, even ["]retarded" * * * as he referenced her in several telephone calls to his sister, Teresa Brown."

(Apr. 29, 2016 Tr., Vol. I, at 159). He testified that he "listened to the phone calls between [Thornton] and [Dahms]. [He] read the letters afterwards and saw how he was pounding things into her head trying to manipulate her. That's why [he] put he's manipulating [Thornton]. He was trying." (*Id.* at 162). He further testified that Dahms

> didn't tell [him] to talk to [Thornton]. He said he didn't think she'd remember anything. And then as soon as [Detective Frankart] started listening to jail phone calls, he was on the phone talking to [Thornton], "Remember, I was there from April 17th on." He was setting it up.

(*Id.* at 155). Detective Frankart read another portion of one of Dahms's letters to Thornton for the jury:

> "All you need to do is tell the truth. I don't care how you write it or what you say. Just tell them the truth: that I was at your house and stayed there the night of Monday, April 20th, and had a job orientation the next morning at 8:00 a.m. Sarah, please."
>
> * * *
>
> "I did not do [sic]. Please. Also, tell them how Kira lies to the cops. She lied in February to cause me trouble to remember[?] Listen, please. I need you and you know I would help you."

(*Id.* at 132). (*See also* State's Ex. 13).

{¶41} Detective Frankart testified that, although he never dealt with Yonikuss, Evans informed him that Yonikuss and Dahms have a similar height and build. (Apr. 27, 2016 Tr., Vol. II, at 162-163). He agreed that it was possible that Yonikuss was in Fostoria on April 20-21, 2015 because he could not confirm whether Yonikuss was in Wyoming. (*Id.* at 222-224); (Apr. 29, 2016 Tr., Vol. I, at 112).

{¶42} He further testified that Dahms told him that "Kira has tried to cause trouble with the police for [Dahms]" in the past. (Apr. 27, 2016 Tr., Vol. II, at 210-211). Detective Frankart testified that Evans or Andy told him that it is "a pretty good assumption" that Kira would lie to get Dahms in trouble. (*Id.* at 212-213). Regarding the hooded sweatshirt, he testified that Evans was in possession of the hooded sweatshirt, but told him that it was destroyed after being used "to pull a four-wheeler out with it, and [Evans] ripped it in half and left it where it laid." (Apr. 29, 2016 Tr., Vol. I, at 119).

{¶43} On re-direct examination, Detective Frankart testified that his investigation revealed that Dahms told Kira, Kady, Evans, Andy, and Perrin that he committed the Subway restaurant break-in. (*Id.* at 165). In the audio recordings of Dahms's phone calls, which were played for the jury, Dahms did not accuse Yonikuss of the break-in. (*Id.* at 166). Dahms was the only person who claimed

that Yonikuss was the perpetrator. (*Id.* at 172). However, multiple witnesses indicated that Dahms perpetrated the break-in. (*Id.* at 172-173).

{¶44} Detective Frankart testified that Kira's story did not change throughout his investigation. (*Id.* at 167). Regarding the video recording of Kira's interview, which was played for the jury, Kira can be heard telling Detective Frankart that the break-in occurred April 19-20, 2015. (*Id.* at 167). However, Detective Frankart testified that Kira later called him to tell him that she was mistaken about the date of the brake-in and "corrected" her statement. (*Id.* at 168-169). Detective Frankart testified that Kira's phone call correcting her statement made her statement "even more significant." (*Id.* at 169). He testified that, in addition to telling him what Dahms told Kira about the break-in, Kira reported that she observed Dahms "with a wad of cash, change, and a 'Thank You' bag. And she knew it was over $300, because [Dahms] counted it in front of her." (*Id.* at 171). Although Evans and Andy indicated that Kira might lie, Evans and Andy confirmed Kira's story that Dahms committed the break-in. (*Id.* at 171-172).

{¶45} On re-cross examination, Detective Frankart testified that, because Kira, Kady, Andy, and Evans live within close proximity to each other at Nye's Trailer Park, they could have colluded to blame the break-in on Dahms. (*Id.* at 178). However, he testified that Andy and Evans's collusion did not "make sense, because Andy and [Evans] really did not want to testify against [Dahms]. Neither wrote a

statement. They both showed up because they were subpoenaed." (*Id.* at 178-179).
Neither Evans nor Andy wanted to be involved in the case against Dahms, which is
why Andy did not appear at trial to testify. (*Id*. at 179)

{¶46} After the State presented its witnesses, it moved to admit its exhibits.
(Apr. 29, 2016 Tr., Vol. II, at 184). Dahms objected to State's Exhibits 7 and 20,
which were admitted over Dahms's objections. (*Id.* at 184-185). The remainder of
the State's exhibits were admitted without objection, and the State rested. (*Id.* at
186). Next, Dahms made a Crim.R. 29(A) motion, which the trial court denied. (*Id.*
at 186-188).

{¶47} The defense called five witnesses. As one of its witnesses, the defense
called Teresa to testify. (Apr. 29, 2016 Tr., Vol. II, at 256). Teresa testified that
she spoke with Thornton "three or four times a day." (*Id.* at 291). According to
Teresa, Thornton was "adamant" that Dahms stayed at her house the night of April
20-21, 2015. (*Id.* at 292-293).

{¶48} Teresa testified that Dahms "wanted [her] to go help [Thornton] do [a
statement for law enforcement] because [Thornton] can't – she can't write. She
can't spell." (*Id.* at 264). Teresa testified that Dahms "just wanted [her] to go over
and let [Thornton] say what she wanted [her] to write, because she can't spell or
write," and that he wanted Thornton to tell the truth. (*Id.* at 276-277). Teresa did
not help Thornton write that statement because Thornton

said that she was going to write a statement and she never did. And she told me numerous, numerous times that [Dahms] was there that night. I mean, "There's no way he could have done it," come out of her mouth, and "He was there."

(*Id.* at 264). She further testified,

I never really refused to help [Thornton] write her statement. [Thornton] just kind of flim-flammed [sic] around, like, "Yeah, I'm going to do it. No, I don't want to do it. Yeah, I'm going to do it. Well, if they need me in court, I'll just go to court for him."

I mean, I more or less had to bribe her in the form of two bags of groceries to go pick up [Dahms's] clothes and stuff. And there, I had to leave a message to tell her that I had groceries for her so she would even call me back.

(*Id.* at 276). Teresa testified that Dahms owed Thornton "close to $500" because Thornton loaned him money to pay for his court fines. (*Id.* at 293).

{¶49} Teresa testified that she wrote to Dahms and told him that she "was going to call [the Housing Authority] on [Thornton]" to report her for allowing Dahms to stay with her so that Thornton would lose her housing assistance. (*Id.* at 290). As a result, Dahms wrote a letter to Thornton telling her that Teresa was going

to report her. (*Id.* at 290-291, 293). According to Teresa, Thornton was upset with Dahms for not paying her back. (*Id.* at 294).

{¶50} On cross-examination, the State played for the jury an audio recording of a June 30, 2015 conversation between Teresa and Detective Frankart. (*Id.* at 302). In that recording, Teresa can be heard telling Detective Frankart that Thornton called her, after receiving Dahms's letter threatening to report Thornton to the Housing Authority, to tell Teresa that she received "a bad letter" from Dahms. (*Id.* at 309). Also in that conversation, Teresa can be heard denying to Detective Frankart that she threatened to report Thornton to the Housing Authority. (*Id.* at 304). Further, Teresa can be heard telling Detective Frankart that she received a letter from Dahms instructing her to write a statement for Thornton and instructing her to begin the statement by writing, "my name is Sarah -- whatever her name, Thorn --." (*Id.* at 324-325). She can be heard explaining that Dahms wanted her to lie for him and "say [she] seen [sic] [him when she] didn't see him" because she doesn't "know where he was that night." (*Id.* at 336). She continued,

> And just like me [sic] and [Thornton] talked, well, if this goes all the way to trial and [Thornton] knows something about it, don't write a statement. Let them subpoena you in. Then you're going to be on the bench. And if you lie, you lie. * * * Then you're in trouble."

(*Id.* at 337). Teresa testified that she lied to Detective Frankart about threatening to report Thornton to the Housing Authority because she "did not want to get in trouble." (*Id.* at 315).

{¶51} Dahms testified in his defense. (Apr. 29, 2016 Tr., Vol. III, at 365). He testified that "slept at [Thornton's] house that night" and "woke up at [Thornton's] house that morning." (*Id.* at 378). Further, he testified that he did not go to Fostoria on the night of April 20-21, 2015. (*Id.*).

{¶52} Regarding Thornton, he testified that he "did not bribe [Thornton]. [He] owed [Thornton] money. [He] owed [Thornton] a lot of money." (*Id.* at 385). Dahms identified State's Exhibit 13 as a letter he wrote to Thornton, and explained that he wrote the letter because he "wanted her to write a statement for [him]. All though the letter, [he] asked her to tell the truth. That's all [he] wanted [Thornton] to do from the start." (*Id.* at 386). According to Dahms, he "[n]ever asked her to lie for [him]. There's not one mention in any of [his] letters where [he] ever asked her to lie." (*Id.*). To bolster his testimony, Dahms read from the letter:

> It says, "Listen, all I want you to do is tell the truth. I need you to write a statement, Sarah. If you don't write it, my lawyer said that they are going to charge me." * * * I am supposed to start school again in August. If they charge me, I won't be able to. I will get $3,000 in

-28-

loans, and I told you I would give you $500 for a late birthday present

for [Thornton's adult son]"

(*Id.* at 386-387).

{¶53} According to Dahms, he owed Thornton money because she was "giving [him] money to pay court fines." (*Id.* at 387). Further, he testified that he said in his letter that the $500 would be a "late birthday present" for Thornton's adult son because the money that Thornton loaned to him was money that Thornton planned to spend on her son's birthday, and Thornton told Dahms that he needed to return that money to her so she could spend it for the birthday. (*Id.*). Dahms clarified that the letter states, "'I told you I would give you $500,' It doesn't say, 'I will give you $500.'" (*Id.*). Dahms testified that Thornton "blocked [his] calls because [he] was calling her so much * * * [but he] wanted [Thornton] to tell the truth[, he] never asked [Thornton] to lie." (*Id.* at 390). Dahms thought that Thornton blocked his calls because she wanted the money that he owed her, not because he was intimidating her. (*Id.*).

{¶54} On cross-examination, the State played for the jury a video recording of Detective Frankart's interview of another girlfriend of Dahms's, Stephanie Thompson ("Thompson"), whom Dahms claims was also with him the night of April 20-21, 2015, along with another person named "Jade." (*Id.* at 408-409). In the video recording, Thompson can be heard telling Detective Frankart that she

spent the night with Dahms at Thornton's house in March and April 2015. (*Id.* at 412). Thompson recalled that one of the nights she was spending with Dahms, she noticed "two cop cars" outside Thornton's residence "[a]round maybe between, like, 10:00 or 12:00." (*Id.* at 425). According to Thompson, she knew that Dahms "was always in trouble, so [she] text [sic] him and [she] told him, 'There's two cop cars out here' * * * 'I think there's two cop cars out here. I was just letting you know before you pull back in.'" (*Id.* at 425-426). Thompson told Detective Frankart that Dahms was in Fostoria "[f]eeding his dog," which is slang for "[g]etting around with his buddies." (*Id.* at 426). Thompson told Detective Frankart that Dahms returned around 4:00 a.m. (*Id.* at 427). Thompson could not recall if that was on the evening of April 20-21, 2015 because she had been drinking. (*Id.* at 427-428). Later in the conversation, she did not think it was that evening because she remembered that Dahms drove his car that night and Dahms's car was impounded on April 13, 2015. (*Id.* at 428, 430). However, Thompson thought she was with Dahms the night of April 20-21, 2015 because she "bought him food" on April 20, 2015. (*Id.* at 430). Thompson again changed her mind later in the conversation and stated that she "was not there." (*Id.* at 432). Thompson blamed her difficulty remembering on her drinking. (*Id.*).

{¶55} Nevertheless, Dahms testified that he did not tell Detective Frankart that Thompson or "Jade" could provide an alibi for him for the night of April 20-

21, 2015 because Detective Frankart "didn't ask." (*Id.* at 436). Dahms admitted that he did not have statements from Thompson or "Jade" or offer testimony from either witness. (*Id.*).

**{¶56}** Thereafter, the defense moved to admit its exhibits, which were admitted without objection, and rested. (*Id.* at 446-447). The State did not present any witnesses on rebuttal. (*Id.* at 447). Dahms renewed his Crim.R. 29 motion and his motion for a mistrial, which were denied. (*Id.* at 448). The matter was submitted to the jury, which found Dahms guilty as to the counts of the indictment. (*Id.* at 513); (Apr. 30, 2016 Tr. at 2-3).

**{¶57}** We first review the sufficiency of the evidence supporting Dahms's bribery and intimidation-of-a-witness-in-a-criminal-case convictions. *State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, ¶ 68, citing *State v. Wimmer*, 3d Dist. Marion No. 9-98-46, 1999 WL 355190, *1 (Mar. 26, 1999). We will begin by addressing his sufficiency-of-the-evidence argument as it relates to his bribery conviction, then we will address his sufficiency-of-the-evidence argument as it relates to his intimidation-of-a-witness-in-a-criminal-case conviction.

**{¶58}** The criminal offense of bribery is codified in R.C. 2921.02, which provides, in relevant part:

(C) No person, with purpose to corrupt a witness or improperly to influence a witness with respect to the witness's testimony in an official proceeding, either before or after the witness is subpoenaed or sworn, shall promise, offer, or give the witness or another person any valuable thing or valuable benefit.

R.C. 2921.02(C).

{¶59} Under his first assignment of error, Dahms specifically argues that there is insufficient evidence that he committed bribery because there is insufficient evidence that he: (1) "intended to corrupt or otherwise improperly influence [Thornton's] testimony;" (2) offered Thornton a valuable thing or benefit; or (3) influenced Thornton's testimony in an *official proceeding*. (Appellant's Brief at 18).

{¶60} First, we address whether the State presented sufficient evidence that Dahms intended to (1) corrupt the witness or (2) improperly influence her with respect to her testimony in an official proceeding either before or after she was subpoenaed or sworn. *See State v. Marshall*, 8th Dist. Cuyahoga No. 100736, 2015-Ohio-2511, ¶ 56, citing R.C. 2921.02(C). Dahms argues that, because he did not ask Thornton to lie for him, there is insufficient evidence that he intended to corrupt Thornton or otherwise improperly influence her testimony. Stated differently,

Dahms argues that he cannot be convicted of bribery for "encouraging" Thornton to provide "truthful testimony." (Appellant's Brief at 18).

**{¶61}** "[O]ne way to commit bribery under R.C. 2921.02(C) is to offer a valuable thing or benefit with the purpose to corrupt a witness." *Marshall* at ¶ 61. "To corrupt" "means to destroy or undermine the honesty or integrity of another, to taint, to affect." *Id.* at ¶ 57. The trial court similarly defined "to corrupt" in its instructions to the jury.[2] (*See* Apr. 29, 2016 Tr., Vol. III, at 500).

**{¶62}** Dahms avers that he cannot be convicted of bribery if he merely encouraged Thornton to "tell the truth." Dahms's argument is erroneous. Evidence of a defendant expressly asking a witness to change their testimony is not required for the "corrupt" form of bribery. *Marshall* at ¶ 61. Indeed, the State presented sufficient evidence that Dahms intended to corrupt Thornton. The State presented evidence of letters and phone calls from Dahms to Thornton in which he repeatedly asks Thornton to provide law enforcement a statement indicating that Dahms stayed at her residence on April 20-21, 2015. Thornton did not want to make a statement because she did not want to be involved and because she did not want to get in trouble. Yet, to secure her statement, Dahms offered to repay Thornton the money that he owed her.

---

[2] The trial court defined "to corrupt" for the jury as "to destroy or undermined the honesty or integrity of another, to taint, or to *infect*." (Emphasis added.) (Apr. 29, 2016 Tr., Vol. III, at 500). We presume that the trial court meant to say "affect," not "infect."

**{¶63}** Further, while Dahms minimizes his interactions with Thornton, Dahms ignores the evidence in the record that he was manipulating or "coaching" Thornton to tell *his* version of the truth. Purposefully manipulating or coaching a witness to tell a defendant's version of the truth is within the meaning of to corrupt—that is, purposely encouraging a witness to provide the defendant's version of the truth is to taint or affect the honesty or integrity of another. *See State v. Halleck*, 308 N.W.2d 56, 59 (IA.1981) ("To improperly influence a witness is not limited to asking a witness to lie. * * * An improper influence includes offers of a bribe to 'persuade the witness to shade or color his testimony in a certain way, without actually lying.'"), quoting 4 Yeager & Carlson, *Iowa Practice: Criminal Law and Procedure*, 445 (1979), and citing *State v. Ventola*, 122 Conn. 635, 640 (1937) and *State v. Liss*, 145 Minn. 45, 51 (1920); *Liss* at syllabus (concluding that the "defendant's belief in the truth of the statement which by the payment of money he was influencing the witness to make was not a defense"). *See also* Annotation, *Falsity of contemplated testimony as condition of offense of bribery of, attempt to bribe, or acceptance of bribe or gift by, prospective witness*, 110 A.L.R. 582 (Originally published 1937) (looking to the common law roots of the offense of bribery and noting that "The dictum that it seemed to be a common-law offense to offer money to swear to a particular thing, 'whether true or false,' was expressed in *R. v. Darby*, (1702) 87 Eng. Rep. 1121.").

{¶64} Thornton suffered from memory loss from her strokes, and Dahms knew that Thornton was easily manipulated and even referred to her as "retarded." Thornton testified that not only did Dahms ask her to write a statement, but also told her to include in her statement that Dahms was at her residence on that date. There is abundant evidence in the record of Dahms manipulating or coaching Thornton to remember his version of the truth through his numerous letters and phone calls to Thornton—that is, the record reflects that Dahms was purposefully persuading Thornton "to shade or color [her statement] in a certain way." *See Halleck* at 59 (concluding that the State provided sufficient evidence that Halleck committed bribery because Halleck "'did intend to direct the nature, character, mode and manner of the testimony'").

{¶65} As such, we conclude that Dahms's manipulation or coaching of Thornton to provide law enforcement with his version of the truth coupled with his promise to repay Thornton the money that he owed her in exchange for her statement is sufficient evidence that Dahms acted with purpose to corrupt Thornton. *See Marshall*, 2015-Ohio-2511, at ¶ 65 ("A reasonable jury could also conclude that Marshall acted with purpose to corrupt when he sought to influence or change M.T.'s likely position at Castro's sentencing by offering her money.").

{¶66} Second, Dahms argues that there is insufficient evidence that he offered Thornton a valuable thing or benefit because Dahms was merely offering to

return money to Thornton that he previously borrowed from her. "There can be no doubt that money is a 'valuable thing or benefit' for the purposes of R.C. 2921.02." *Marshall* at ¶ 60. Whether Dahms's promise of payment to Thornton was the promise of the repayment of a loan or was the promise of a gift is inconsequential. *See State v. Nader*, 8th Dist. Cuyahoga No. 43697, 1982 WL 5208, *4 (concluding that there was sufficient evidence that Nader committed bribery "[r]egardless of whether the payments are designated as a loan or gift" because Nader intended to influence the city building inspector); *State v. Lieberman*, 114 Ohio App. 339, 343 (10th Dist.1961) (concluding that the refund of the payment for realty constitutes a valuable thing or benefit). Indeed, regardless of whether Dahms's promise to pay Thornton is designated as the repayment of a loan, gift, or otherwise, he intended to corrupt Thornton with his promise to repay her the $500 that he owed her.

{¶67} Finally, Dahms argues that there is insufficient evidence that he influenced Thornton's testimony in an official proceeding because "[m]aking a statement to the police prior to any indictment is not an 'official proceeding.'" (Appellant's Brief at 19). "[T]here are two distinct ways to commit bribery under statute: (1) offering or giving any valuable thing or benefit with purpose to *corrupt* a witness; or (2) offering or giving any valuable thing or benefit to *improperly influence* a witness." (Emphasis added.) *Marshall* at ¶ 46. The modifier, "with respect to the witness's testimony in an official proceeding" applies only to the

"improperly influence" form of bribery, not the "corrupt" form of bribery. *See id.* Because we conclude that there is sufficient evidence that Dahms committed the "corrupt" form of bribery, Dahms's argument is not well taken, and we need not address whether there is sufficient evidence of the modifier requiring the witness's testimony be part of an official proceeding.

{¶68} Accordingly, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Dahms committed bribery. As such, Dahms's bribery conviction is based on sufficient evidence.

{¶69} Moving to his intimidation-of-a-witness-in-a-criminal-case conviction, Dahms argues that there is insufficient evidence that: (1) he intimidated a witness in a criminal case because there is insufficient evidence that the witness was a witness as defined by the statute; and (2) he made an unlawful threat.

{¶70} The criminal offense of intimidation of a witness in a criminal case is codified in R.C. 2921.04, which provides, in relevant part:

> No person, knowingly and by force or by unlawful threat of harm to
> any person * * * or by unlawful threat to commit any offense or
> calumny against any person, shall attempt to influence, intimidate, or
> hinder any of the following persons:
>
> * * *

(2)   A witness to a criminal * * * act by reason of the person being a

witness to that act.

R.C. 2921.04(B)(2).

**{¶71}** First, we will address whether the State presented sufficient evidence

that Thornton is a witness as defined under the statute.   The statute defines a

"witness" as "any person who has or claims to have knowledge concerning a fact or

facts concerning a criminal * * * act, whether or not criminal * * * charges are

actually filed."  R.C. 2921.04(E).[3]

**{¶72}** Dahms argues that "Thornton was not a witness to the alleged

crime"—that is, that "[s]he had no knowledge of the evens that happened at Subway

or [Dahms's] alleged involvement in said act."  (Appellant's Brief at 19).  However,

Dahms's argument is belied by the fact that he alleged that Thornton was his alibi

witness during the time the break-in of the Subway restaurant occurred.  Clearly, an

alibi witness is a person who has or claims to have knowledge concerning a fact or

facts concerning a criminal act—namely, that the accused did not commit the

criminal act of which they are accused of committing.  *See State v. Wallace*, 9th

Dist. Lorain No. 06CA008889, 2006-Ohio-5819, ¶ 19 ("An alibi witness is defined

as "[a] witness who testifies that the defendant was in a *location other than the scene*

---

[3] R.C. 2921.04 was amended in 2012 to add the definition of a witness.  2012 Sub.H.B. 20, 2012 Ohio Laws, File 83. *See also State v. Davis*, 132 Ohio St.3d 25, 2012-Ohio-1654, ¶ 3, fn.1 (acknowledging the General Assembly's amendment of R.C. 2921.04 broadening the definition of a "witness" under the statute).

*of the crime at the relevant time.*") (Emphasis sic.), quoting *Black's Law Dictionary* 1633 (8th Ed.2004).

**{¶73}** The State presented sufficient evidence that Thornton is a witness as defined under R.C. 2921.04(E). That is, a rational trier of fact could conclude that Thornton had knowledge concerning facts concerning a criminal act—namely, knowledge that Dahms was in a location other than the Subway restaurant at the time of the break-in—making her a witness as defined by R.C. 2921.04(E). *See State v. Brent*, 10th Dist. Franklin No. 14AP-187, 2014-Ohio-5246, ¶ 16. That Thornton did not witness the criminal act does not preclude her from being a witness as defined by R.C. 2921.04(E). *See State v. Fonseca*, 3d Dist. Henry No. 7-16-04, 2016-Ohio-7348, ¶ 18, citing *State v. Fox*, 5th Dist. Licking No. 13-CA-71, 2014-Ohio-1652, ¶ 31 ("Appellant maintains he could not be convicted of intimidation of a witness because Spires was not a witness to the alleged offense as she did not see what occurred between himself and A.M. Appellant's assertion has no merit.").

**{¶74}** Next, Dahms argues that he cannot be convicted of intimidating a witness in a criminal case because there is insufficient evidence that he made an unlawful threat of harm. "The Supreme Court of Ohio has held that 'an unlawful threat of harm' is satisfied only when the very making of the threat is itself unlawful because it violates established criminal or civil law.'" *State v. Jackson*, 12th Dist. Fayette No. CA2011-01-001, 2011-Ohio-5593, ¶ 48, quoting *State. v. Cress*, 112

Ohio St.3d 72, 2006-Ohio-6501, ¶ 42. Stated differently, "'the threat itself, not the threatened conduct, must be unlawful.'" *State v. Khaliq*, 5th Dist. Licking No. 15-CA-64, 2016-Ohio-7859, ¶ 27, quoting *State v. Yambrisak*, 5th Dist. Richland No. 2012-CA-50, 2013-Ohio-1406, ¶ 31, citing *Cress* at ¶ 38. "'An unlawful threat must accordingly connote more than just a threat, i.e. more than just a communication to a person that particular negative consequences will follow should the person not act as the communicator demands.'" *Jackson* at ¶ 48, quoting *Cress* at ¶ 41. "Thus, the Supreme Court's decision in *Cress* suggests that in order for the state to meet its burden in an R.C. 2921.04(B) prosecution, the threat must violate a predicate offense." *Id.*, citing *Cress* at ¶ 42-43 and *State v. Armstrong*, 9th Dist. Summit No. 24479, 2009-Ohio-5941, ¶ 19. "However, the Court in *Cress* did not hold that the 'predicate offense' must be identified in the indictment or otherwise specified by the state." *Id.*, citing *State v. Ott*, 11th Dist. Portage No. 2007-P-0093, 2008-Ohio-4049, ¶ 26 and *Armstrong* at ¶ 19.

{¶75} The State presented sufficient evidence that Dahms made an unlawful threat because the State presented sufficient evidence that Dahms committed the predicate offense of coercion in violation of R.C. 2905.12. *See Cress* at ¶ 43 (concluding that conduct constituting the offense of coercion under R.C. 2905.12 serves "as a predicate offense for the crime of witness intimidation as proscribed by

R.C. 2921.04(B)"). The criminal offense of coercion is codified under R.C. 2905.12, which provides:

(A) No person, with purpose to coerce another into taking or refraining from action concerning which the other person has a legal freedom of choice, shall do any of the following:

(1) Threaten to commit any offense;

(2) Utter or threaten any calumny against any person;

(3) Expose or threaten to expose any matter tending to subject any person to hatred, contempt, or ridicule, to damage any person's personal or business repute, or to impair any person's credit;

(4) Institute or threaten criminal proceedings against any person;

(5) Take, withhold, or threaten to take or withhold official action, or cause or threaten to cause official action to be taken or withheld.

R.C. 2905.12(A). Indeed, a rational trier of fact could conclude that Dahms intended to coerce Thornton to provide law enforcement with a statement by threatening to take official action by reporting Thornton to the Housing Authority. *See State v. Zylko*, 8th Dist. Cuyahoga No. 89949, 2008-Ohio-3032, ¶ 41 (concluding that "the trial court could have reasonably inferred from defendant's statements in the phone call to Deacon Senn that his intention was to intimidate or coerce Deacon Senn from pressing charges or cooperating in defendant's criminal

prosecution by making a false charge or misrepresentation maliciously calculated to harm Deacon Senn's reputation."). As such, viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have reasonably inferred the unlawfulness of the threat communicated by Dahms to constitute coercion in violation of R.C. 2905.12(A). *See Jackson* at ¶ 51; *Zylko* at ¶ 42. Therefore, we conclude that there is sufficient evidence that Dahms intimidated a witness in a criminal case.

{¶76} Having concluded that Dahms's bribery and intimidation-of-a-witness-in-a-criminal-case convictions are based on sufficient evidence, we next address Dahms's argument that his bribery, intimidation-of-a-witness-in-a-criminal-case, breaking-and-entering, and complicity-to-tampering-with-evidence convictions are against the manifest weight of the evidence. *Velez*, 2014-Ohio-1788, at ¶ 76.

{¶77} As an initial matter, we note that Dahms does not make any argument under his second assignment of error conveying how his bribery and intimidation-of-a-witness-in-a-criminal-case convictions are against the manifest weight of the evidence. "[A] defendant has the burden of affirmatively demonstrating the error of the trial court on appeal." *State v. Stelzer*, 9th Dist. Summit No. 23174, 2006-Ohio-6912, ¶ 7, citing *State v. Cook*, 9th Dist. Summit No. 20675, 2002-Ohio-2646, ¶ 27. "Moreover, '[i]f an argument exists that can support this assignment of

error, it is not this court's duty to root it out.'" *Id.*, quoting *Cook* at ¶ 27. "App.R. 12(A)(2) provides that an appellate court 'may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A).'" *State v. Jackson*, 10th Dist. Franklin No. 14AP-670, 2015-Ohio-3322, ¶ 11, quoting App.R. 12(A)(2). "Additionally, App.R. 16(A)(7) requires that an appellant's brief include '[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies.'" *Id.*, quoting App.R. 16(A)(7). Not only did Dahms fail to include an argument regarding how his bribery and intimidation-of-a-witness-in-a-criminal-case convictions are against the manifest weight of the evidence, but Dahms failed to provide citations to the authorities, statutes, and parts of the record that support his argument.

{¶78} As we noted above, sufficiency of the evidence and manifest weight of the evidence are *different* legal concepts. *Thompkins*, 78 Ohio St.3d at 389. That Dahms incorporated his "arguments made above [under his sufficiency-of-the-evidence assignment of error] for the Bribery and Intimidation of a Witness charges" in his conclusory paragraph under his second assignment of error does not comport with the requirements of App.R. 12(A)(2) or (16)(A)(7) because

sufficiency of the evidence and manifest weight of the evidence are *different* legal concepts, which require *different* arguments. (*See* Appellant's Brief at 23).

{¶79} However, in the interest of justice, we will address the merits of Dahms's arguments. *See State v. Thomas*, 3d Dist. Mercer No. 10-10-17, 2011-Ohio-4337, ¶ 25. Applying Dahms's arguments that he makes in support of his sufficiency-of-the-evidence assignment of error, we conclude that the jury did not clearly lose its way and create such a manifest miscarriage of justice that Dahms's bribery and intimidation-of-a-witness-in-a-criminal-case convictions must be reversed and a new trial ordered.

{¶80} Indeed, the evidence that we summarized in our sufficiency-of-the-evidence analyses supporting Dahms's bribery and intimidation-of-a-witness-in-a-criminal-case convictions is weightier than the evidence against those convictions. First, regarding Dahms's bribery conviction, despite the evidence that Dahms relies on in support of his sufficiency-of-the-evidence argument, the evidence that he committed bribery outweighs any evidence that he did not commit that crime. In his sufficiency-of-the-evidence argument, Dahms points to the evidence that: (1) Thornton would not lie for Dahms; (2) Dahms did not ask Thornton to lie for him; and (3) Dahms was merely promising to repay a loan made to him by Thornton when he promised to pay her $500 for her son's birthday. However, that evidence does not outweigh the evidence that Dahms intended to corrupt Thornton.

{¶81} The evidence of Dahms manipulating or coaching Thornton to provide law enforcement with Dahms's version of the truth overwhelmingly supports Dahms's intent to persuade Thornton to shade or color her testimony in a way that would benefit Dahms. There is ample evidence in the record that Thornton is susceptible to manipulation and has difficulty recalling events—traits that Dahms was aware of and exploited. Further, because we concluded that the promise to repay a loan constitutes the promise of a valuable thing or benefit under R.C. 2921.02(C), that Dahms was merely promising Thornton to repay her money that she loaned him does not weigh against his conviction; rather, it weighs in favor of conviction. Therefore, we conclude that Dahms's bribery conviction under R.C. 2921.02(C) is not against the manifest weight of the evidence.

{¶82} Second, Dahms's intimidation-of-a-witness-in-a-criminal-case conviction is not against the manifest weight of the evidence. In his sufficiency-of-the-evidence argument, Dahms points to evidence that: (1) Thornton did not witness the Subway restaurant break-in; and (2) Dahms did not make "any threat of harm or calumny against Thornton." (Appellant's Brief at 20). Although Thornton did not witness the Subway restaurant break-in, Dahms alleges that Thornton is his alibi witness for the time at which the Subway restaurant break-in occurred. Stated differently, Dahms alleges that Thornton witnessed that Dahms did not commit the Subway restaurant break-in. As such, because Dahms alleges that Thornton is his

alibi witness, Thornton is a witness under R.C. 2921.04(B)—a fact which weighs in favor of conviction.

{¶83} Moreover, the evidence that we summarized in our sufficiency-of-the-evidence analysis supporting that Dahms made an unlawful threat is weightier than Dahms's contention that he did not threaten Thornton. Dahms erroneously contends that the evidence that he did not unlawfully threaten Thornton outweighs the evidence that he unlawfully threatened Thornton because "reporting Thornton to [the Housing Authority] would have been a truthful statement" since "[t]here is evidence to show that [Dahms] was, in fact, living with Thornton for some time." (Appellant's Brief at 20). Dahms ignores that his threat to cause a report to be made regarding Thornton to the Housing Authority—regardless of its truth—amounted to coercion. Indeed, the evidence that Dahms coerced Thornton is overwhelming. Not only did Dahms include in a letter to Thornton his threat that a report would be made to Housing Authority against Thornton, the State presented evidence that Thornton felt threatened by Dahms to the extent that she blocked him from being able to call her. Further, the State presented evidence that Dahms threatened possible consequences if Thornton did not provide law enforcement with a statement, including that (1) Dahms would be charged with a crime; (2) Thornton would have to appear in court "five times"; and (3) Thornton would be arrested if she did not appear, especially because she does not have transportation to court. For these

-46-

reasons, we conclude that Dahms's intimidation-of-a-witness-in-a-criminal-case conviction is not against the manifest weight of the evidence.

{¶84} Moving to Dahms's argument that his breaking-and-entering and attempted-complicity-to-tampering-with-evidence convictions are against the manifest weight of the evidence, we conclude that, "[e]ven removing the lens of favorability in favor of the prosecution, through which we examine the sufficiency of the evidence, this is not an exceptional case where the evidence weighs heavily against the convictions." *State v. Suffel*, 3d Dist. Paulding No. 11-14-05, 2015-Ohio-222, ¶ 33.

{¶85} R.C. 2911.13 sets forth the offense of breaking and entering and provides, in relevant part, "(A) No person by force, stealth, or deception, shall trespass in an unoccupied structure, with purpose to commit therein any theft offense, as defined in section 2913.01 of the Revised Code, or any felony." R.C. 2911.13(A). Dahms does not dispute the evidence concerning the underlying elements of the breaking-and-entering offense of which he was convicted; rather, he disputes the issue of identity as to the conviction. *See State v. Missler*, 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, ¶ 13. As such, we will address only the identity element of the offense. *Id.*, citing *State v. Carter*, 2d Dist. Montgomery No. 25447, 2013-Ohio-3754, ¶ 9-12. "'It is well settled that in order to support a conviction, the evidence must establish beyond a reasonable doubt the identity of

-47-

the defendant as the person who actually committed the crime at issue.'" *Id.*, quoting *State v. Johnson*, 7th Dist. Jefferson No. 13 JE 5, 2014-Ohio-1226, ¶ 27, citing *State v. Collins*, 8th Dist. Cuyahoga No. 98350, 2013-Ohio-488, ¶ 19, and *State v. Lawwill*, 12th Dist. Butler No. CA2007-01-014, 2008-Ohio-3592, ¶ 11.

{¶86} On appeal, Dahms argues that his breaking-and-entering conviction is against the manifest weight of the evidence because there is no "direct physical evidence" linking Dahms to the Subway restaurant break-in, and the jury lost its way in believing the testimony of Kira, Evans, and Perrin over Dahms's assertion that Yonikuss was the person who committed the crime. (Appellant's Brief at 21-22).

{¶87} There is limited direct evidence linking Dahms to the Subway restaurant break-in—namely, the surveillance video. (*See* State's Ex. 17). While the person seen in the surveillance video is unidentifiable, Detective Frankart testified that Dahms matches the build of the person seen in that video. The surveillance video was played for the jury, and the jury was able to observe Dahms in the courtroom.

{¶88} Dahms contends that Yonikuss—who allegedly looks similar to Dahms—committed the Subway restaurant break-in. However, Dahms's self-serving contention that Yonikuss is the perpetrator of the break-in is outweighed by the evidence revealed by Detective Frankart's investigation that: (1) Yonikuss was

evading law enforcement because there was a warrant for his arrest; (2) Yonikuss allegedly went to Wyoming prior to the break-in; (3) Dahms had motive to blame Yonikuss after Yonikuss blamed Dahms for a prior theft; (4) Dahms did not allege that Yonikuss is the perpetrator to anyone else; and (5) Dahms was the only person to allege that Yonikuss is the perpetrator.

{¶89} Dahms further argues that the State's theory of the case is belied by the evidence that he did not have transportation from Findlay—where he was allegedly staying with Thornton—to Fostoria, which is a 15-20 minute drive from Findlay, to commit the Subway restaurant break-in. Aside from Dahms's self-serving version of events, Thornton is the only witness to allege to have seen Dahms in Findlay the night of the break-in. While Thornton claimed that she saw Dahms before she went to sleep between 10:00 p.m. and 1:00 a.m. on April 20 and right as she woke up around 7:50 a.m. on April 21, 2015, the State presented evidence that Thornton suffered several strokes and had difficulty remembering events. Likewise, the State presented evidence that Thornton was easily manipulated and that Dahms regarded Thornton as "retarded." The jury was free to disbelieve Thornton's testimony, especially in light of the testimony of the other witnesses who said they saw Dahms in Fostoria shortly after the Subway restaurant break-in, confessing to the break-in. Moreover, at one point, Dahms asserted to Detective Frankart that he was with Thompson and Jade at Thornton's house the night of the break-in;

however, Dahms did not offer a statement or the testimony of Thompson or Jade. Nevertheless, the jury heard Detective Frankart's interview of Thompson, who could not be sure of what night she was with Dahms because she was intoxicated.

{¶90} Dahms also contends that the testimony of Kira, Evans, and Perrin is unbelievable compared to Dahms's version of events. Indeed, Dahms points to weaknesses in Kira's, Evans's, and Perrin's testimony, which Dahms argues undermines their credibility. Dahms argues that the jury lost its way in concluding that he was the person who committed the Subway restaurant break-in because Kira's testimony is not credible because she "was shown to be willing to lie just to get [Dahms] in trouble." (Appellant's Brief at 21).

{¶91} However, the jury heard Detective Frankart's testimony in which he concluded Kira to be credible in her report that Dahms was the person who committed the Subway restaurant break-in because Kira knew specific facts regarding the break-in that were not available to the public, her story was consistent, and she voluntarily called him to correct her statement when she realized that she provided an incorrect date of when the break-in occurred. Moreover, Dahms's theory that Kira had a motive to lie because she was angry with him for ending their relationship, and because she has a history of reporting Dahms to law enforcement when she was angry with him, is belied by the evidence that Kira could have

reported Dahms to law enforcement for the injuries she sustained when Dahms drug her with his vehicle.

{¶92} Further, Dahms argues that Kira's credibility is undermined by the lack of evidence in Kira's phone that Dahms called her a "snitch" as she reported to law enforcement. However, the jury heard Kira's recorded statement in which she recalled that she could not remember whether Dahms called her a "snitch" through text message or by phone conversation, but that she was adamant that Dahms called her a snitch, and she testified to the same. The jury was free to infer whether Kira was lying about the Subway restaurant break-in or revealing the truth.

{¶93} Moreover, Kady, Andy, Evans, and Perrin provided consistent accounts to that of Kira's linking Dahms to the break-in throughout Detective Frankart's investigation, and Kady, Evans, and Perrin testified to the same. Indeed, Kira, Kady, Andy, and Evans indicated that they saw Dahms after the break-in and that Dahms confessed to them to committing the break-in. Evans further indicated that Dahms suggested to him prior to the break-in that he was going to "hit a lick," or steal money, later that day and asked him to join him. That Evans declined Dahms's offer is supported by the video surveillance, which depicts only one perpetrator. Similarly, Perrin testified that Dahms admitted to him multiple times that he committed the break-in. The jury was free to believe or disbelieve their testimony.

**{¶94}** Collectively, the State's witnesses testified that Dahms was the person who committed the break-in. While there were some issues with those witnesses' credibility, "'[t]he jury, as the trier of facts, "may believe or disbelieve any witness or accept part of what a witness says and reject the rest."'" *Missler*, 2015-Ohio-1076, at ¶ 44, quoting *State v. Daley*, 3d Dist. Seneca No. 13-13-26, 2014-Ohio-2128, ¶ 68, quoting *State v. Antill*, 176 Ohio St. 61, 67 (1964). "'"A verdict is not against the manifest weight of the evidence because the [jury] chose to believe the State's witnesses rather than the defendant's version of the events."'" *Id.*, quoting *State v. Bean*, 9th Dist. Summit No. 26852, 2014-Ohio-908, ¶ 15, quoting *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. In sum, Dahms's arguments concerning the evidence that he is not the person who committed the Subway restaurant break-in are unpersuasive, especially compared to the weighty evidence against him discussed above. As such, Dahms's breaking-and-entering conviction is not against the manifest weight of the evidence.

**{¶95}** Finally, Dahms's attempted-complicity-to-tampering-with-evidence conviction is not against the manifest weight of the evidence. R.C. 2921.12 sets forth the offense of tampering with evidence and provides, in relevant part:

(A)  No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:

(1)   Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation;

R.C. 2921.12(A)(1).   R.C. 2923.02, Ohio's attempt-crime statute, provides, in relevant part, "(A) No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."   R.C. 2923.02(A).   R.C. 2923.03 sets for the offense of complicity and provides, in relevant part, "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:  (1) Solicit or procure another to commit the offense."   R.C. 2923.03(A)(1).

{¶96} Dahms does not point to any evidence that weighs against his attempted-complicity-to-tampering-with-evidence conviction.  Dahms's letters and the recordings of Dahms's phone calls speak for themselves.  The jury was able to hear Dahms instruct multiple witnesses to discard potential evidence.  Indeed, Dahms can be heard instructing Evans to dispose of "trash," which Evans stated meant that Dahms wanted him to dispose of the hooded sweatshirt and the safe box.  Likewise, Dahms can be heard instructing Thornton to dispose of the letters in which he bribed her to provide law enforcement with an alibi.  For these reasons, we reject Dahms's argument.

**{¶97}** Dahms's first and second assignments of error are overruled.

**Assignment of error No. III**

**Appellant received Ineffective Assistance of Trial Counsel.**

**{¶98}** In his third assignment of error, Dahms argues that his trial counsel was ineffective. In particular, he argues that his trial counsel was ineffective for failing to assert that his right to a speedy trial was violated.

**{¶99}** A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 687. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Carter*, 72 Ohio St.3d 545, 558 (1995). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St. 3d 136, 141-42

(1989), quoting *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976), *vacated in part on other grounds*, 438 U.S. 910, 98 S.Ct. 3135 (1978).

**{¶100}** "Prejudice results when 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *State v. Liles*, 3d Dist. Allen No. 1-13-04, 2014-Ohio-259, ¶ 48, quoting *Bradley* at 142, citing *Strickland* at 691. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Bradley* at 142 and citing *Strickland* at 694.

**{¶101}** "When a claim of ineffective assistance of counsel is based on counsel's failure to file a particular motion, a defendant must show that the motion had a reasonable probability of success." *State v. Ferguson*, 10th Dist. Franklin No. 16AP-307, 2016-Ohio-8537, ¶ 11, citing *State v. Carmon*, 10th Dist. Franklin No. 11AP-818, 2012-Ohio-1615, ¶ 9 and *State v. Barbour*, 10th Dist. Franklin No. 07AP-841, 2008-Ohio-2291, ¶ 32, citing *State v. Adkins*, 161 Ohio App.3d 114, 2005-Ohio-2577 (4th Dist.). Here, Dahms's ineffective-assistance-of-counsel claim centers on his trial counsel's failure to file a motion to dismiss based on an alleged violation of his right to a speedy trial. *See State v. Matland*, 7th Dist. Mahoning No. 09-MA-115, 2010-Ohio-6585, ¶ 15. As such, an analysis of Dahms's third assignment of error necessitates a review of the law pertaining to speedy-trial rights. *Id.*

{¶102} "An accused is guaranteed the constitutional right to a speedy trial pursuant to the Sixth and Fourteenth Amendments of the United States Constitution and Ohio Constitution, Article I, Section 10." *Ferguson* at ¶ 12, citing *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, ¶ 32. "Ohio's speedy trial statutes, found in R.C. 2945.71 et seq., were implemented to enforce those constitutional guarantees." *Id.*, citing *Brecksville v. Cook*, 75 Ohio St.3d 53, 55 (1996) and *State v. Blackburn,* 118 Ohio St.3d 163, 2008-Ohio-1823, ¶ 10. "The proper standard of review in speedy trial cases is to simply count the number of days passed, while determining to which party the time is chargeable, as directed in R.C. 2945.71 and 2945.72." *Id.*, citing *State v. Jackson*, 10th Dist. No. 02AP-468, 2003-Ohio-1653, ¶ 32, citing *State v. DePue*, 96 Ohio App.3d 513, 516 (4th Dist.1994).

{¶103} "R.C. 2945.71 provides the timeframe for a defendant's right to a speedy trial based on the level of offense." *Matland* at ¶ 19. "[A] person against whom a charge of felony is pending shall be brought to trial within two hundred seventy days after his arrest." R.C. 2945.71(C)(2). "The date of the arrest is not included for the purpose of calculating time under the statutes for a speedy trial." *State v. Taylor*, 3d Dist. Allen No. 1-13-46, 2014-Ohio-1793, ¶ 27, citing *State v. Huston*, 3d Dist. Wyandot Nos. 16-05-23 and 16-05-24, 2006-Ohio-6857, ¶ 7.

{¶104} "However, each day the defendant spends in jail solely on the pending criminal charge counts as three days." *Matland* at ¶ 19, citing R.C.

2945.71(E). "For purposes of this calculation, the Tenth District Court of Appeals has clarified, 'where more than one charge has arisen from a single transaction and the multiple charges share a common litigation history from arrest onward, incarceration on the multiple charges will be considered incarceration on the 'pending charge' for purposes of [R.C.] 2945.71(E).'" *Id.*, quoting *State v. Madden,* 10th Dist. Franklin No. 04AP-1228, 2005-Ohio-4281, ¶ 29-30, citing *State v. Parsley*, 82 Ohio App.3d 567, 571, (10th Dist.1993). A defendant cannot benefit from the "triple-count provision" under R.C. 2945.71(E) when he or she is being held in jail on other charges. *State v. Stephens*, 9th Dist. Summit No. 26516, 2013-Ohio-2223, ¶ 12, citing *State v. Skorvanek*, 9th Dist. Lorain No. 08CA009399, 2009-Ohio-3924, ¶ 11, citing *State v. MacDonald*, 48 Ohio St.2d 66 (1976), paragraph one of the syllabus. *See also State v. Brown*, 64 Ohio St.3d 476, 479-480 (1992). "Instead, the 270-day time limit contained in R.C. 2945.71(C)(2) applies." *Stephens* at ¶ 12, citing *State v. Richter*, 9th Dist. Summit No. C.A. NO. 11799, 1985 WL 10977 (Feb. 13, 1985) and *MacDonald* at 71.

{¶105} "R.C. 2945.72 allows for an extension of the time that the accused must be brought to trial under certain circumstances." *Taylor* at ¶ 28. Excluded from the speedy trial calculation is "[a]ny period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused." R.C. 2945.72(E). Also excluded from the speedy-trial calculation is

"[t]he period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion." R.C. 2945.72(H).

{¶106} In this case, Dahms's trial counsel was not ineffective for failing to file a motion to dismiss alleging a violation of Dahms's speedy-trial rights because Dahms cannot demonstrate that the motion would have had a reasonable probability of success. *See Matland* at ¶ 50 (concluding that Matland's trial counsel was not ineffective for failing to file a motion to dismiss based on an alleged violation of his right to a speedy trial because that motion "would have failed unequivocally").

{¶107} The speedy-trial clock began to run on August 7, 2015—the day after which Dahms was arrested in this case—and ran for 56 days before speedy-trial time was tolled as a result of multiple motions filed by Dahms delaying his trial. (*See* Doc. Nos. 4, 22, 23, 26, 34, 35, 36, 37, 39, 43, 44, 45, 47, 50, 51, 52, 53, 56).[4]

---

[4] Dahms was already in jail for other offenses when he was "arrested" on August 6, 2015 for the charges underlying this case. (Doc. No. 4). As such, the speedy-trial clock began on August 7, 2015. Dahms filed a motion on October 2, 2016 causing the speedy-trial clock to toll for the time necessary to adjudicate that motion. (Doc. No. 22); R.C. 2945.72(E). However, before that motion could be adjudicated, Dahms withdrew that motion on October 13, 2015. (Doc. No. 34). That same day, Dahms filed a motion to continue trial, which the trial court granted and rescheduled trial for December 15-16, 2015. (Doc. Nos. 35, 37, 39). *See also* R.C. 2945.72(H). On November 24, 2015, Dahms filed another motion tolling the speedy-trial clock for the time necessary to adjudicate that motion. (Doc. No. 43); R.C. 2945.72(E). To adjudicate that motion, the trial court held a hearing on December 4, 2015 in which the trial court granted Dahms's motion and scheduled an evidentiary hearing for December 17, 2015. (Doc. Nos. 51, 52). On November 30, 2015, Dahms filed a third motion tolling the speedy-trial clock for the time necessary to adjudicate that motion. (Doc. No. 44); R.C. 2945.72(E). Also, on November 30, 2015, Dahms filed a second motion to continue trial, which the trial court granted. (Doc. Nos. 45, 47). After a hearing on December 4, 2015, the trial court denied Dahms's third motion on December 9, 2015. (Doc. Nos. 50, 53). After the December 17, 2015 evidentiary hearing, the trial court on December 22, 2015 rescheduled trial for April 26-28, 2016. (Doc. No. 56). *See also* R.C. 2945.72(H).

Indeed, Dahms filed three motions tolling the speedy-trial clock for the time necessary to adjudicate those motions—the last being timely disposed of on December 22, 2015 after a December 17, 2015 evidentiary hearing. As such, at that time, the only remaining matter was to reschedule Dahms's trial as a result of Dahms's November 30, 2015 motion to continue trial, which was granted by the trial court. The trial court rescheduled Dahms's trial for April 26-28, 2016 in its December 22, 2015 entry. "[I]t is well-established that a defense motion to continue trial tolls the speedy trial clock until the rescheduled trial date." *State v. Caulton*, 7th Dist. Mahoning No. 09 MA 140, 2011-Ohio-6636, ¶ 33, citing R.C. 2945.72(H) and *State v. Brown*, 7th Dist. Mahoning No. 03 MA 32, 2005-Ohio-2939, ¶ 41. *See also State v. Quinnie*, 10th Dist. Franklin No. 12AP-484, 2013-Ohio-1208, ¶ 8. Accordingly, the speedy-trial clock was tolled until the rescheduled trial date.

{¶108} Thus, even if we assume without deciding that Dahms benefitted from the "triple-count provision" under R.C. 2945.71(E), Dahms was brought to trial well-within 90 days because the speedy-trial clock ran only 56 days. Therefore, Dahms cannot demonstrate that a motion to dismiss alleging a speedy-trial rights violation would have had a reasonable probability of success. Because Dahms cannot demonstrate that a motion to dismiss alleging a speedy-trial rights violation would have had a reasonable probability of success, Dahms's ineffective assistance

of counsel claim fails. *See State v. Schlosser*, 3d Dist. Union No. 14-10-30, 2011-Ohio-4183, ¶ 34.

{¶109} Dahms's third assignment of error is overruled.

### Assignment of Error No. IV

**Appellant's right to due process was violated as the State failed to disclose exculpatory evidence it had in its possession.**

{¶110} In his fourth assignment of error, Dahms argues that he was denied due process of law because the State failed to disclose 181 jailhouse calls. It appears that Dahms is arguing that the State's failure to disclose those jailhouse calls amounted to a "*Brady* violation."

{¶111} "'[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *State v. Davis*, 116 Ohio St.3d, 2008-Ohio-2, ¶ 338, quoting *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194 (1963). However, the United States Supreme Court later clarified, "'The rule of *Brady* * * * arguably applies in three quite different situations. Each involves the discovery, *after trial*, of information which had been known to the prosecution but unknown to the defense.'" (Emphasis added.) *State v. Wickline*, 50 Ohio St.3d 114, 116 (1990), quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392 (1976).

{¶112} As an initial matter, Dahms's reliance on *Brady* is misplaced because *Brady* involves the discovery of evidence after trial. *See State v. Jackson*, 10th Dist. Franklin No. 02AP-867, 2003-Ohio-6183, ¶ 24. Based on the United States Supreme Court's clarification regarding the scope of *Brady*, the Supreme Court of Ohio concluded that "no *Brady* violation occurs when evidence is discovered and presented during the trial." *State v. Wilson*, 3d Dist. Union No. 14-13-04, 2013-Ohio-4643, ¶ 22, citing *Wickline* at 116. Dahms concedes that he received the jailhouse phone calls prior to the start of trial. (*See* Appellant's Brief at 26). (*See also* Apr. 26, 2016 Tr., Vol. I, at 111). As such, no *Brady* violation exists. *See State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, ¶ 82.

{¶113} Nonetheless, Dahms argues that the trial court erred when it denied his oral motion to continue trial for the purpose of investigating whether the State withheld exculpatory evidence. "When a defendant discovers that the State withheld potentially exculpatory evidence during the course of the trial proceedings, and not after, Crim.R. 16(L), and not *Brady,* governs." *Wilson* at ¶ 22, citing *Wickline* at 116-117.[5] Crim.R. 16(L) provides, in relevant part:

> The trial court may make orders regulating discovery not inconsistent
>
> with this rule. If at any time during the course of the proceedings it is

---

[5] When the Supreme Court of Ohio issued its decision in *State v. Wickline*, "the applicable Rule of Criminal Procedure governing discovery sanctions was Crim.R. 16(E)(1)." *State v. Wilson*, 3rd Dist. Union No. 14-13-04, 2013-Ohio-4643, ¶ 22, fn.1. "However, Rule 16 of the Rules of Criminal Procedure was subsequently amended on July 1, 2010, and the current section governing discovery sanctions is Crim.R. 16(L)(1)." *Id.*

Case No. 13-16-16

brought to the attention of the court that a party has failed to comply with this rule * * *, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.

Crim.R. 16(L)(1).

**{¶114}** "'The trial court has discretion to regulate discovery in a manner consistent with Crim.R. 16.'" *State v. Mobley*, 2d Dist. Montgomery No. 26858, 2016-Ohio-4579, ¶ 23. As such, we review a trial court's response to allegations of noncompliance with the criminal-discovery rules under an abuse-of-discretion standard. *See State v. Wilson*, 192 Ohio App.3d 189, 2011-Ohio-155, ¶ 54 (11th Dist.), citing Crim.R. 16(L)(1), *State v. Wiles*, 59 Ohio St.3d 71, 78 (1991), *State v. Parson*, 6 Ohio St.3d 442, 445 (1983), and *State v. Edwards*, 49 Ohio St.2d 31, 42 (1976). *See also State v. Adams*, 7th Dist. Mahoning No. 00 CA 211, 2006-Ohio-1761, ¶ 40, citing *Parson* at 445.

**{¶115}** It appears that Dahms is arguing that the trial court abused its discretion by denying his motion to continue trial because that penalty "would have been the least restrictive means to correct the non-disclosure." (Appellant's Brief at 26). When determining whether to impose a discovery-rule sanction, "'[a] trail court must inquire into the circumstances surrounding a discovery rule violation and

-62-

* * * must impose the least severe sanction that is consistent with the purpose of the rules of discovery.'"  *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, syllabus, quoting *Lakewood v. Papadelis*, 32 Ohio St.3d 1 (1987), paragraph two of the syllabus.  The Supreme Court of Ohio identified three factors that a trial court should consider when a discovery violation is alleged:  "(1) whether the failure to disclose was a willful violation of Crim.R. 16; (2) whether foreknowledge of the undisclosed material would have benefitted the accused in the preparation of a defense; and (3) whether the accused was prejudiced."  *Id.* at ¶ 35, citing *Parson* at syllabus.

{¶116} In this case, the trial court inquired into the circumstances surrounding the alleged Crim.R. 16 violation as it is required to do.  *See State v. Bressi*, 9th Dist. Summit No. 27575, 2016-Ohio-5211, ¶ 11("'[A] trial court must inquire into the circumstances producing [an] alleged violation of Crim.R. 16.'"), quoting *State v. Bellomy*, 9th Dist. Wayne No. 97CA0036, 1998 WL 161292, *2 (Apr. 8, 1998).  Dahms's trial counsel represented to the trial court that he "receive[d] a disc from the sheriff's department that contains possibly hundreds and hundreds of audio files * * * never heard." (Apr. 26, 2016 Tr., Vol. I, at 111).  He continued, "I found a reference in the audio [which was provided by the State] after examining many, many hours * * * of audio of my client that referred to I think nine other phone calls.  So I asked my client about nine other phone calls, and that's

when he started telling me there's many, many other calls that we've never heard and that were never produced to me." (*Id.* at 112). In response, the State indicated that it "provided all of the calls that [it] deem[ed] relevant that [it] intend[s] to use" because "there are hundreds of phone calls, and [the State] do[es] not have the resources to listen to every single phone call made from jail on every single one of [its] cases." (*Id.* at 114-115). The State added that

> this case has been ongoing since August of 2015. We actually prepared for trial, it as originally set for trial, in October of 2015. Had [Dahms's trial counsel] requested [the State] certainly would have done so.
>
> However, he waited until the night before trial to request all of these.

(*Id.* at 115). Ultimately, Dahms's trial counsel requested that the trial court "pause the trial and come back and resume it" or in the alternative to sanction the State by preventing it "from putting on any evidence related to this audio or testimony that could be in the audio." (*Id.* at 119). The trial court agreed that the appropriate sanction is to prevent the State from using "anything that hasn't been provided in discovery." (*Id.* at 120). As such, the trial court denied Dahms's motion to continue trial. (*See id.* at 121).

{¶117} Even if we assume without deciding that the jailhouse phone calls are properly discoverable evidence, the trial court did not abuse its discretion by

imposing the discovery-rule-violation sanction prohibiting the State from using any evidence that may be contained in the jailhouse calls. First, we note that Dahms requested that the trial court either continue trial *or* prohibit the State from using the jailhouse calls not provided through discovery as evidence. That Dahms now complains on appeal that the trial court selected from Dahms's proposed remedies is invited error. *See State v. Cunigan*, 195 Ohio App.3d 162, 2011-Ohio-4010, ¶ 12 (2d Dist.), citing *Daimler/Chrysler Truck Fin. v. Kimball*, 2d Dist. Champaign No. 2007-CA-07, 2007-Ohio-6678, ¶ 40, citing 5 Ohio Jurisprudence 3d, Appellate Review, Section 448, at 170-171 (1999, Supp.2007). "'The "invited error doctrine" holds that a party will not be permitted to take advantage of an error which he himself invited or induced the court to make.'" *State v. Arnold*, 3d Dist. Seneca No. 13-16-13, 2017-Ohio-326, ¶ 12, quoting *State v. Ritch*, 4th Dist. Scioto No. 97CA2491, *4 (May 11, 1998), citing *State ex rel. O'Berine v. Geauga Cty. Bd. of Elections*, 80 Ohio St.3d 176, 181 (1997) and *State ex rel. Bitter v. Missig*, 72 Ohio St.3d 249, 254 (1995). *See also State v. Monnette*, 3d Dist. Marion No. 9-08-33, 2009-Ohio-1653, ¶ 12, citing *State v. Ransom*, 3d Dist. Van Wert No. 15-06-05, 2006-Ohio-6490, ¶ 14.

{¶118} Nevertheless, the trial court did not abuse its discretion by denying Dahms's motion to continue trial. As with its regulation of discovery under Crim.R. 16, "[t]he trial court has broad discretion to grant or deny a motion for a

continuance." *State v. Moody*, 2d Dist. Montgomery No. 26926, 2016-Ohio-8366,

¶ 38, citing *State v. Bones*, 2d Dist. Montgomery No. 26017, 2015-Ohio-784, ¶ 61.

"In exercising its discretion, a trial court should consider 'the length of the delay

requested; whether other continuances have been requested and received; the

inconvenience to litigants, witnesses, opposing counsel and the court; whether the

requested delay is for legitimate reasons or whether it is dilatory, purposeful, or

contrived; whether the defendant contributed to the circumstance which give [sic]

rise to the request for a continuance; and other relevant factors, depending on the

unique facts of each case.'" *Id.*, quoting *State v. Bocock*, 2d Dist. Montgomery No.

22481, 2008-Ohio-5641, ¶ 23.

**{¶119}** As we previously noted, Dahms was granted two continuances in this

case. The State informed the trial court that Dahms's trial counsel had in his

possession in August 2015 the audio tapes from which Dahms's trial counsel

claimed to have learned of the existence of the other jailhouse calls. Yet, Dahms's

trial counsel waited until April 2016—just before trial—to review those recordings.

Likewise, Dahms's trial counsel revealed that he learned from Dahms of the

additional calls just prior to the commencement of trial—a conversation that could

have occurred in the months leading up to trial. It is also unclear why Dahms did

not reveal to his trial counsel the existence of those jailhouse calls—or whether there

is potentially exculpatory evidence contained in those calls—prior to the time his

trial was to commence. Accordingly, we conclude that the trial court did not abuse its discretion by denying Dahms's motion to continue trial. *See Bressi*, 2016-Ohio-5211, at ¶ 23 (concluding that the trial court did not abuse its discretion by denying Bressi's motion to continue trial because "he waited until the afternoon before his rescheduled trial date to bring the issue of the recordings to the court's attention" and "[i]t is pure speculation that any additional questioning of the witnesses would have caused [the State's witness] to change his testimony").

{¶120} Therefore, we conclude that the trial court did not abuse its discretion by preventing the State from using the jailhouse calls not provided through discovery as evidence—that is, imposing the least severe sanction that it determined to be consistent with the purpose of the rules of discovery.

{¶121} Dahms's fourth assignment of error is overruled.

### Assignment of Error No. V

**The Trial Court erred in ordering Appellant to serve a mandatory term of Post-Release Control.**

{¶122} In his fifth assignment of error, Dahms argues that the trial court erred by ordering him to serve a mandatory period of post-release control. More specifically, Dahms argues that the trial court erred by imposing a mandatory three-year period of post-release control as to his bribery and intimidation-of-a-witness-in-a-criminal-case convictions because those offenses are not offenses of violence.

{¶123} Under R.C. 2953.08(G)(2), an appellate court will reverse a sentence "only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1. Clear and convincing evidence is that "'which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *Id.* at ¶ 22, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶124} Ohio's post-release control statute is codified under R.C. 2967.28. R.C. 2967.28 "defines whether a term of post-release control is mandatory or discretionary with the parole board and sets forth the length of the term, depending on the degree of felony and whether the offense is a felony sex offense." *State v. Threats*, 7th Dist. Jefferson No. 15JE0005, 2016-Ohio-8478, ¶ 16, citing R.C. 2967.28(B), (C). "For instance, post-release control is mandatory when a prison term is imposed for a felony of the first degree, a felony of the second degree, a felony sex offense, or a felony of the third degree that is an offense of violence." *Id.*, citing. R.C. 2967.28(B). "For a felony of the first degree or for a felony sex offense, the term of post-release control must be five years." *Id.*, citing R.C. 2967.28(B)(1). "Unless the offense is a felony sex offense, the term of post-release

control is a mandatory three years for a second degree felony or third degree felony offense of violence." *Id.*, citing R.C. 2967.28(B)(2).

**{¶125}** "If a prison sentence is imposed for a felony of the third degree that is not a felony sex offense and is not an offense of violence, then the parole board has the discretion to impose post-release control for 'up to three years.'" *Id.* at ¶ 17, citing R.C. 2967.28(C).

**{¶126}** Dahms challenges the trial court's imposition of a mandatory three-year period of post-release control as to his bribery and intimidation-of-a-witness-in-a-criminal-case convictions. The State concedes that the trial court erred by ordering Dahms to serve a mandatory three-year term of post-release control as to his bribery conviction. We agree. Dahms was convicted of bribery under R.C. 2921.02(C), a third-degree felony. Bribery under R.C. 2921.02(C) is not a felony sex offense or an offense of violence. *See* R.C. 2901.01(A)(9) (defining offense of violence).

**{¶127}** However, we reject Dahms's argument regarding his intimidation-of-a-witness-in-a-criminal-case conviction under R.C. 2921.04(B)(2). Intimidation-of-a-witness-in-a-criminal-case conviction under R.C. 2921.04(B)(2) is an offense of violence. *See* R.C. 2901.01(A) (including violations of R.C. 2921.04 in the definition of "offense of violence"). Therefore, the trial court

properly imposed the mandatory three-year period of post-release control as part of Dahms's sentence as to his intimidation-of-a-witness-in-a-criminal-case conviction.

**{¶128}** Dahms' fifth assignment of error is overruled in part and sustained in part.

**{¶129}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued in assignments of error one, two, three, four, and five, in part, we affirm the judgment of the trial court. Having found error prejudicial to the appellant herein in the particulars assigned and argued in assignment of error five, in part, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**SHAW, J., concurs.**
**WILLAMOWSKI, J., concurs in Judgment Only.**

**/jlr**